[Cite as *In re Z.W.*, 2025-Ohio-1410.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
HANCOCK COUNTY

IN RE:

    Z.W.,

ADJUDICATED
DEPENDENT CHILD.

[MCKENNA P. - APPELLANT]

CASE NO. 5-24-18

OPINION AND
JUDGMENT ENTRY

---

IN RE:

    C.P.,

ADJUDICATED NEGLECTED
AND DEPENDENT CHILD.

[MCKENNA P. - APPELLANT]
[JOHNATHON P. - APPELLANT]

CASE NO. 5-24-19

OPINION AND
JUDGMENT ENTRY

---

IN RE:

    B.P.,

ADJUDICATED NEGLECTED AND
DEPENDENT CHILD.

[MCKENNA P. - APPELLANT]
[JOHNATHON P. - APPELLANT]

CASE NO. 5-24-20

OPINION AND
JUDGMENT ENTRY

Case Nos. 5-24-18, 5-24-19, 5-24-20, 5-24-21

---

**IN RE:**

    **J.P.,**

                            **CASE NO. 5-24-21**

**ADJUDICATED NEGLECTED AND
DEPENDENT CHILD.**
                            **OPINION AND
JUDGMENT ENTRY**

**[MCKENNA P. - APPELLANT]**
**[JOHNATHON P. - APPELLANT]**
**[J.P. - APPELLANT]**

---

**Appeals from Hancock County Common Pleas Court
Juvenile Division
Trial Court Nos. 2022 AND 0039, 20213011, 20213012 and 20213013**

**Judgments Affirmed
Date of Decision: April 21, 2025**

---

**APPEARANCES:**

    *Dorothy L. Williams* **for Appellant McKenna P.**
    *John C. Filkins III* **for Appellant Johnathon P.**
    *Alison Boggs* **for Appellant J.P.**
    *Miranda M. Lobdell* **for Appellee**

**WALDICK, P.J.**

*Case Number 5-24-18*

{¶1} In this appeal, mother-appellant, McKenna P. ("McKenna"), appeals

the May 28, 2024 judgment of the Hancock County Common Pleas Court, Juvenile

Division, granting permanent custody of her daughter "Z.W." to the appellee,

Hancock County Job and Family Services – Children's Protective Services Unit ("CPSU" or "the agency"). For the reasons set forth below, we affirm the judgment of the trial court.

*Case Numbers 5-24-19, 5-24-20, and 5-24-21*

**{¶2}** In these three appeals, mother-appellant, McKenna P. ("McKenna"), and father-appellant, Johnathon P. ("Johnathon"), separately appeal the June 10, 2024 judgments of the Hancock County Common Pleas Court, Juvenile Division, granting permanent custody of their children, C.P., J.P., and B.P., to the appellee, Hancock County Job and Family Services – Children's Protective Services Unit ("CPSU" or "the agency"). Additionally, child-appellant, "J.P", appeals the June 10, 2024 judgment of the Hancock County Common Pleas Court, Juvenile Division, in which permanent custody of J.P. was granted to the agency. For the reasons set forth below, we affirm the judgment of the trial court in all three cases.

*Procedural History – Case Number 5-24-18*

**{¶3}** Z.W., a female child, was born in 2022 to McKenna and Quayshawn L., an unmarried couple. One day after her birth, Z.W. was removed from McKenna's custody by the Findlay Police Department, due to McKenna attempting to leave the hospital with Z.W. against medical advice.

**{¶4}** On May 20, 2022, a complaint was filed alleging Z.W. to be a neglected and dependent child. On May 23, 2022, a shelter care hearing was held and Z.W. was ordered into the temporary custody of CPSU.

-3-

{¶5} On June 28, 2022, an adjudicatory hearing was held and Z.W. was found to be a dependent child. Upon motion of the agency, the neglect allegation was dismissed. A dispositional hearing was held on that same date and Z.W. was continued in the temporary custody of CPSU.

{¶6} On April 28, 2023, the agency's temporary custody of Z.W. was extended for an additional six months.

{¶7} On November 28, 2023, CPSU filed a motion for permanent custody of Z.W.

{¶8} On May 13 and 14, 2024, a hearing was held on the permanent custody motion.[1]

{¶9} On May 28, 2024, the trial court filed a judgment entry in which the court reviewed the record of the case and detailed the evidence presented at the hearing. After conducting that review, and upon applying the relevant legal standards, the trial court granted the agency's motion for permanent custody and terminated the parental rights of McKenna and Quayshawn as to Z.W.

{¶10} On June 21, 2024, McKenna filed an appeal of the trial court's May 28, 2024 decision.

---

[1] Prior to the start of that hearing, Quayshawn consented to the motion for permanent custody of his daughter, and written stipulations relating to his consent were signed by him and submitted to the trial court. Following a detailed inquiry by the trial court, the court accepted Quayshawn's consent, and then excused him and his counsel from the proceedings.

{¶11} On July 10, 2024, this court ordered that the appeal in Z.W.'s case be consolidated with the appeals that had been filed in the cases relating to C.P., J.P., and B.P.

*Procedural History - Case Numbers 5-24-19, 5-24-20, and 5-24-21*

{¶12} C.P., a male child, was born in 2013 to McKenna and Johnathon, an unmarried couple. J.P., a male child, was born in 2016 to McKenna and Johnathon. B.P., a female child, was also born in 2016 to McKenna and Johnathon.

{¶13} On February 24, 2021, complaints alleging C.P., J.P., and B.P. to be abused, neglected, and dependent children were filed in the trial court. On February 25, 2021, a shelter care hearing was held as to all three children and the trial court ordered that the children be placed in the temporary custody of CPSU.

{¶14} On May 14, 2021, an adjudicatory hearing was held as to all three cases, and the trial court found the three children to be neglected and dependent children. Upon motion by the agency, the abuse allegation was struck from the complaints. A dispositional hearing was held that same date in the three cases, and the trial court placed the children in Johnathon's custody and granted CPSU protective supervision over the children.

{¶15} On October 26, 2021, CPSU filed an emergency motion to remove the children from Johnathon, due to bruises on two of the children and abuse allegations. A hearing was held that same day and the trial court ordered that the children be placed in the temporary custody of CPSU.

{¶16} On October 14, 2022, CPSU filed motions for permanent custody as to all three children.

{¶17} On February 2, 2023, CPSU withdrew the motions for permanent custody. On that same date, CPSU filed for a six-month extension of its temporary custody of all three children. On March 6, 2023, the motions for a six-month extension of temporary custody were heard, and the trial court granted the motions as to all three children.

{¶18} On June 22, 2023, CPSU filed new motions for permanent custody of the three children. However, on August 23, 2023, the trial court filed consent judgments in the three cases that withdrew the motions for permanent custody, returned the children to Johnathon's custody, and continued the protective supervision of the children by the agency.

{¶19} On October 5, 2023, the trial court signed an ex parte order placing the children in the temporary custody of CPSU due to unexplained bruises on B.P. and allegations of sexual acts having been perpetrated on B.P. by C.P. and J.P. Following hearings held on October 10, 2023 and November 30, 2023, the trial court found that probable cause existed for the issuance of the ex parte order and the removal of the children from Johnathon's home.

{¶20} On October 6, 2023, CPSU filed its third set of motions for permanent custody of all three children.

**{¶21}** Beginning on May 20, 2024 and concluding on May 23, 2024, a multi-day hearing was held on the motions for permanent custody.

**{¶22}** On June 10, 2024, the trial court filed a judgment entry in each of the three cases, in which the court reviewed the record of the case and detailed the evidence presented at the multi-day permanent custody hearing. After conducting that review, and upon applying the relevant legal standards, the trial court granted the agency's motion for permanent custody in each case and terminated the parental rights of McKenna and Johnathon as to each of the three children.

**{¶23}** On June 21, 2024, McKenna filed appeals of the trial court's June 10, 2024 decision in all three cases. On July 3, 2024, Johnathon filed appeals of the trial court's June 10, 2024 decision in all three cases. On July 9, 2024, J.P. filed an appeal of the trial court's June 10, 2024 decision in the case relating to him.

**{¶24}** On July 10, 2024, this court ordered that the appeals in the cases relating to C.P., J.P., and B.P. be consolidated with the appeal filed in the case relating to Z.W.

**Assignments of Error on Appeal**

**{¶25}** In Case Number 5-24-18, which relates to Z.W., McKenna appeals the trial court's decision, and raises one assignment of error.

**McKenna's Assignment of Error –
Case Number 5-24-18**

**The finding that the mother had failed to remedy the causes of the removal was against the manifest weight of the evidence.**

**{¶26}** In Case Numbers 5-24-19, 5-24-20, and 5-24-21, which relate to C.P., B.P., and J.P., respectively, McKenna and Jonathon separately appeal the trial court's decisions. In the case relating to J.P.'s custody, Case Number 5-24-21, J.P. has also appealed the trial court's decision

**McKenna's Assignment of Error –
Case Numbers 5-24-19, 5-24-20, and 5-24-21**

**The finding that the mother had failed to remedy the causes of the removal was against the manifest weight of the evidence.**

**Johnathon's First Assignment of Error –
Case Numbers 5-24-19, 5-24-20, and 5-24-21**

**The trial court abused its discretion and committed reversible and plain error when it found it was in the best interest of the children to grant permanent custody to appellee because that decision was not in the best interest of the children, was against the manifest weight of the evidence, and was not supported by clear and convincing evidence.**

**Johnathon's Second Assignment of Error –
Case Numbers 5-24-19, 5-24-20, and 5-24-21**

**The trial court erred in removing all three of the minor children from the custody of father on October 3, 2023, and by its failure to return at least the two minor boys, C.P. and J.P., to the custody of their father for insufficient evidence was presented as to these two children to justify their removal.**

**Johnathon's Third Assignment of Error –
Case Numbers 5-24-19, 5-24-20, and 5-24-21**

**The trial court erred as the result of its refusal to permit appellate counsel to review the in camera interviews of the minor children.**

**J.P.'s First Assignment of Error –
Case Number 5-24-21**

**The trial court erred when it failed to conduct J.P.'s in camera
interview before the start of the permanent custody hearing, or
any time during the three day hearing, to his prejudice and
detriment, preventing his trial attorney from being fully prepared
to represent him.**

**J.P.'s Second Assignment of Error –
Case Number 5-24-21**

**The trial court erred in overruling appellate counsel's motion to
review the transcript of J.P.'s in camera interview in preparation
for the appeal.**

**J.P.'s Third Assignment of Error –
Case Number 5-24-21**

**The trial court abused its discretion when it summarily ignored
J.P.'s due-process rights to remain with a biological parent,
finding it was in his best interest that his parents' parental rights
be terminated.**

**J.P.'s Fourth Assignment of Error –
Case Number 5-24-21**

**The trial court did not have jurisdiction to proceed with the
permanent custody hearing when the agency dismissed the case.**

{¶27} For the sake of orderliness and clarity, we opt to address the

assignments of error out of the order in which they have been raised.  Additionally,

to avoid unnecessary repetition in our analysis of similar claims, we shall jointly or

collectively address parallel assignments of error raised by the appellants.

*J.P.'s Fourth Assignment of Error*

**{¶28}** In J.P.'s fourth assignment of error, he asserts that the trial court lacked jurisdiction to proceed with the permanent custody hearing. Specifically, J.P. argues that jurisdiction was lost by the trial court once the agency filed a motion to dismiss. In support of this claim, J.P. relies on a recent decision of this Court, *In re E.R.*, 2024-Ohio-4840 (3d Dist.).

**{¶29}** The case of *In re E.R.* presented this Court with appeals by two parents of a trial court's termination of their parental rights. *Id.*, at ¶ 1. In that case, the appellee-agency had filed motions in the trial court for permanent custody of two children on June 5, 2023. *Id.*, at ¶ 3. On October 19, 2023, the agency filed a motion to dismiss the children's cases, due to time restrictions. *Id.*, at ¶ 4. The agency also filed new motions for permanent custody. *Id.* That same date, the trial court granted the motion to dismiss and dismissed the complaints. *Id.* Subsequently, upon the father filing a motion for return of the children, the trial court reversed the prior dismissal of the case. *Id.* On February 26, 2024, the trial court held a hearing on the outstanding motions for permanent custody and, following the hearing, the trial court granted permanent custody to the agency. *Id.*, at ¶ 5. On appeal, the father challenged the trial court's reconsideration of its order granting the agency's motion for a voluntary dismissal. *Id.*, at ¶ 6. In addressing that claim, this Court noted that, "'[i]n general, when a trial court unconditionally dismisses a case or a case has been voluntarily dismissed ..., the trial court patently and unambiguously lacks

-10-

jurisdiction to proceed.'" *Id.*, quoting *State ex rel. Hummel v. Sadler*, 2002-Ohio-3605, ¶ 22. We further noted that "the 'Ohio Rules of Civil Procedure do not provide a procedure for reconsideration by a trial court of its final judgment; therefore, any judgment entered in response to such a motion is a nullity.'" *Id.*, quoting *Wilson v. Johnston*, 2002-Ohio-4690, ¶ 6 (3d Dist.). Accordingly, this Court held that, because the agency had moved for dismissal and the trial court then unconditionally dismissed the cases, the cases were over and the trial court lost all jurisdiction to proceed in the dismissed cases. *Id.*, at ¶ 7. We further found that any subsequent judgments entered in the cases were nullities, based on the lack of jurisdiction. *Id.*

{¶30} However, contrary to J.P.'s claim in his appeal in the instant case, the cases here involve a procedural history distinguishable from that of *In re E.R.* In the cases involving J.P. and his two siblings, CPSU initially filed motions for permanent custody on October 14, 2022. Those motions were withdrawn by the agency on February 2, 2023, simultaneous to the agency filing for a six-month extension of its temporary custody of the children. On March 6, 2023, the motions for a six-month extension of temporary custody were heard, and the trial court granted those motions. On June 22, 2023, CPSU filed new motions for permanent custody. However, on August 23, 2023, the trial court signed consent agreements in the cases that returned the children to Johnathon's custody and withdrew the agency's motions for permanent custody, with the agency retaining protective

-11-

custody of the children.  On October 6, 2023, CPSU filed its third set of motions for permanent custody, which were the motions that were heard and subsequently granted by the trial court.

{¶31} Thus, unlike the situation in *In re E.R.*, *supra*, no unconditional dismissal of the cases in this matter was ever ordered. Rather, the agency withdrew its first two sets of permanent custody motions, and did so pursuant to also filing alternative motions on each occasion that were granted by the trial court and which permitted the agency to continue working with the parents toward reunification.  Accordingly, we find J.P.'s reliance on *In re E.R.* to be misplaced and his argument regarding the trial court's jurisdiction to be without merit.

{¶32} J.P.'s fourth assignment of error is overruled.

*J.P.'s First Assignment of Error*

{¶33} In J.P.'s first assignment of error, he asserts that the trial court committed reversible error in failing to conduct J.P.'s in camera interview prior to, or during, the permanent custody hearing.  J.P. argues that in conducting the interview with him one week after the permanent custody hearing concluded, the trial court deprived J.P.'s attorney of the opportunity to attend the interview and to fully prepare for the hearing.

{¶34} In this case, and in the cases involving C.P. and B.P., counsel for Johnathon filed motions asking the trial court to conduct in camera interviews with the children, which the trial court ultimately granted.  The record reflects that the

court's interview with J.P. took place on May 29, 2024, several days after the permanent custody hearing concluded on May 23, 2024. Upon review, we find J.P.'s claim of error regarding the timing of the interview to lack merit for several reasons.

**{¶35}** R.C. 2151.414(D) provides that, in determining the best interest of a child in a permanent custody action, the court must consider all relevant factors, including the wishes of the child. However, R.C. 2151.414(D)(1)(b) specifically provides that consideration of the wishes of the child may be "as expressed directly by the child *or* through the child's guardian ad litem[.]" (Emphasis added.). Thus, "a juvenile court has the option of either having the child assert his or her opinion, through, for example, an in-camera interview or testimony, or the court may rely upon the guardian ad litem's representations with respect to the child's desires." *In re Funk*, 2002-Ohio-4958, ¶ 30 (11th Dist.). "Because the juvenile court has a choice, the decision not to conduct an in camera interview will be reversed only if the court abused its discretion in declining to do so." *Id*., citing *In re Whitaker*, 36 Ohio St.3d 213, 219 (1988). *Accord, In re C.F.*, 2007-Ohio-1104; *In re Sherman*, 2005-Ohio-3444, ¶ 9 (3d Dist.), opinion vacated on other grounds on reconsideration, 2005-Ohio-5888, ¶¶ 9-10 (3d Dist.); *In re S.V.*, 2004-Ohio 5445, ¶¶ 26-28 (9th Dist.).

**{¶36}** In support of the claim regarding the timing of the interview in J.P.'s case, he cites to no statutory or other legal authority setting forth a requirement that

an in camera interview, if held at all, must be held prior to the permanent custody hearing, nor does our own research reflect the existence of any such legal authority. Further, the record in the instant case reflects no objection was lodged by counsel to the fact that the in camera interview had not been conducted prior to the start of the permanent custody hearing. Additionally, as to J.P.'s claim that his attorney was deprived of the opportunity to attend the interview, the record does not definitively reflect whether J.P.'s counsel was present for the interview or not. We do note, however, that no motion was ever filed by J.P.'s counsel requesting to attend the interview, nor does the on-the-record discussion of the interviews at the permanent custody hearing reflect any request by J.P.'s counsel to be present at the interview. While J.P. asserts that holding the interview after the permanent custody hearing deprived his counsel of the opportunity to fully prepare for the hearing, we note that nothing prevented J.P.'s counsel from interviewing J.P. himself, in order to ascertain what J.P.'s own wishes were as to the custody issue, and then using that information in preparing for the hearing.

{¶37} More importantly, the record reflects that the guardian ad litem testified at the permanent custody hearing as to the children's wishes, and specifically noted that J.P. wished to be reunited with his father. Therefore, while the in camera interview with J.P. was not conducted until after the hearing, his wishes were still made known at the time of the hearing, in a manner compliant with R.C. 2151.414(D)(1)(b).

-14-

**{¶38}** Finally, while the permanent custody hearing concluded on May 23, 2024, the record reflects that the trial court took the issue of permanent custody under advisement at the close of the hearing and did not render a decision until June 10, 2024. Thus, the in camera interview with J.P. was conducted prior to the trial court reaching a decision in the case, and the trial court expressly noted in its June 10, 2024 decision that it had considered the wishes of the child as expressed during the in camera interview.

**{¶39}** For all the reasons stated, we find that no error occurred as to the timing of the in camera interview with J.P.

**{¶40}** J.P.'s first assignment of error is overruled.

*Johnathon's Third Assignment of Error and J.P.'s Second Assignment of Error*

**{¶41}** In Johnathon's third assignment of error, he asserts that the trial court erred in denying a post-judgment motion filed by his appellate counsel, which sought an order permitting counsel access to transcripts of the trial court's in camera interviews with the children. Similarly, in J.P.'s second assignment of error, J.P. argues that the trial court erred in denying a motion filed by his appellate counsel, in which counsel sought to review the transcript of J.P.'s in camera interview.

**{¶42}** With respect to those claims, the record reflects that the trial court granted motions requesting that the in camera interviews be transcribed and

transmitted to this Court for inclusion in the record on appeal.[2] However, the court ordered that the interview transcripts be sealed and directed that counsel for the parties on appeal not be provided access to those transcripts, which Johnathon and J.P. now both assert was an erroneous decision.

{¶43} We begin our analysis of these claims by noting that closure is the rule, not the exception, for in camera interviews conducted by a court in a child custody matter. *In re T.B.-G*, 2018-Ohio-4116, ¶ 4 (8th Dist.). "This policy of excluding parties from the interview is so strong that it extends to keeping transcripts of the interview confidential – parties are not normally entitled to review a transcript of the in-camera interview." *Id*., citing *Chapman v. Chapman*, 2007-Ohio-2968, ¶ 27 (2d Dist.); *Lawson v. Lawson*, 2013-Ohio-4687, ¶ 57 (5th Dist.).

{¶44} As to Johnathon's claim in particular, R.C. 3109.04(B)(2)(c) provides that neither a parent nor a parent's attorney has a legal right to be present at an in camera interview of a child in a custody proceeding. Accordingly, several appellate districts have held that parents – or their counsel – also do not have a right to review the transcripts of such interviews, as providing such access would contravene the intent of keeping the interview confidential. *Patton v. Patton*, 1995 WL 42497 (5th Dist. Jan. 9, 1995); *In re Longwell*, 1995 WL 520058 (9th Dist. Aug. 30, 1005); *Willis v. Willis*, 2002-Ohio-3716 (12th Dist.).

---

[2] Transcripts of the interviews with C.P. and J.P. were included in the record transmitted to this Court. In B.P.'s case, an audio-recording of the interview, certified by the trial court as accurate, was provided to this Court in lieu of a transcript.

**{¶45}** Additionally, as the Fifth District Court of Appeals aptly noted in *Patton*, *supra*:

> The logic behind the legislative choice of moving the children into a stress-free environment is evident. Children should display candor in setting forth their feelings * * * . The interview is recorded for the purpose of protecting the parties in that an appellate court may review the recorded interviews and determine whether undue influence has been exerted, or whether the court has made proper findings of fact regarding the in chambers interviews. However, the legislative mandate that no person shall obtain from a child any recorded statement regarding the allocation of parental rights and responsibilities concerning such child clearly minimizes the chilling effect of the in chambers interview and provides a protection of the minor children.

*Id*. at *3.

**{¶46}** We find such reasoning to be sound, given the restrictions contained in R.C. 3109.04(B)(2)(c), and particularly as our own independent review of the in camera interviews on appeal serves to protect both the rights of the parents involved in the cases as well as preserving the privacy of the children who were interviewed. Accordingly, we hold that the trial court did not err in denying Johnathon's request for the interview transcripts for purposes of appeal. Johnathon's third assignment of error is therefore overruled.

**{¶47}** Regarding J.P.'s claim on appeal, we note that a distinction could potentially be made between a parent's right, or lack thereof, to review the transcription of his children's interviews for appellate purposes, as opposed to a child's right to access the transcript of his own interview for appellate

purposes. Unlike the situation involving a parent, when the party requesting to review an in camera interview transcript is the child who was interviewed, or their counsel, no clear statutory basis exists for denying such access. At least one appellate district has drawn a distinction between the right of a parent and the right of a child to obtain a transcript of the child's in camera interview. *In re A.M.R.*, 2017-Ohio-9178 (8th Dist.). In that case, the court of appeals determined that the trial court erred in denying the child's attorney access to a transcript of the child's in camera interview, although that holding was expressly based on "the limited and unique circumstances of [that] case." *Id.*, at ¶ 23.

{¶48} In the instant case, we find it unnecessary to establish a bright-line rule as to the right of a child to obtain access to his own interview transcript on appeal, as we ultimately find that J.P. suffered no material prejudice as a result of the trial court denying J.P.'s counsel access to the interview transcript. Our independent review of the interview conducted with J.P. by the trial court reflects that the conversation was extremely brief and very limited in scope. More importantly, no information was shared by J.P. in that conversation that is not also readily gleaned from the record of the permanent custody hearing. Finally, as noted in the analysis of J.P.'s first assignment of error, *supra*, a trial court's consideration of a child's wishes in a permanent custody action may be accomplished by considering the wishes as expressed directly by the child or as expressed through the child's guardian ad litem. *See* R.C. 2151.414(D)(1)(b). Here, J.P.'s guardian ad litem

testified at the permanent custody hearing and J.P.'s wishes concerning his custody were clearly conveyed by the guardian ad litem at that time. As J.P.'s wishes were made known to both counsel and the trial court at the hearing, and because the record reflects consideration of those wishes by the trial court in reaching its decision, as required by R.C. 2151.414(D), J.P.'s substantial rights were not affected by the trial court limiting J.P.'s access on appeal to his interview transcript. Given the lack of prejudice to J.P. resulting from the trial court's ruling, that decision of the trial court, if error at all, does not rise to the level of error mandating reversal. Therefore, J.P.'s second assignment of error is also overruled.

*McKenna's Assignments of Error, Johnathon's First Assignment of Error,*
*and J.P.'s Third Assignment of Error*

{¶49} In the four cases in which McKenna appeals, in the three cases in which Johnathon appeals, and in the one case in which J.P. appeals, the appellants assert in these assignments of error that the trial court erred in granting permanent custody of the child(ren) at issue to the agency. Specifically, the appellants argue that the trial court's finding that permanent custody was in the best interest of each child was against the manifest weight of the evidence.

{¶50} "[T]he right to raise one's children is an 'essential' and 'basic civil right.'" *In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *Id.* quoting *Santosky v. Kramer*, 455

U.S. 745, 753 (1982). "The rights and interests of a natural parent are not, however, absolute: where a court finds that permanent custody is appropriate under the circumstances of a particular case and all due process safeguards have been followed, whatever residual rights a parent may have are properly divested." *In re Leveck*, 2003-Ohio-1269, ¶ 6 (3d Dist.).

{¶51} "R.C. 2151.414 outlines the procedures that protect the interests of parents and children in a permanent custody proceeding." *In re N.R.S.*, 2018-Ohio-125, ¶ 12 (3d Dist.), citing *In re B.C.*, 2014-Ohio-4558, ¶ 26. "When considering a motion for permanent custody of a child, the trial court must comply with the statutory requirements set forth in R.C. 2151.414." *In re A.M.*, 2015-Ohio-2740, ¶ 13 (3d Dist.). Specifically, "R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody: (1) the trial court must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) the trial court must find that permanent custody is in the best interest of the child." *In re Y.W.*, 2017-Ohio-4218, ¶ 10 (3d Dist.).

{¶52} "The first prong of that test requires a finding by clear and convincing evidence that one of the statutorily-prescribed situations of R.C. 2151.414(B)(1) is satisfied." *In re N.F.*, 2023-Ohio-566, ¶ 19 (3d Dist.). In that regard, R.C. 2151.414 provides:

> (B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section,

-20-

by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

**{¶53}** As to the second prong of the test, when determining the best interest of the child, R.C. 2151.414(D) directs the trial court to consider all relevant factors, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child, with due regard for the maturity of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

**{¶54}** Pursuant to R.C. 2151.414(B)(1), an award of permanent custody must be based on clear and convincing evidence. *In re H.M.*, 2019-Ohio-3721, ¶ 44 (3d Dist.). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "Where the degree of proof required to sustain an

issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.* at 477.

**{¶55}** In reviewing whether a trial court's permanent custody decision is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Eastley v. Volkman*, 2012-Ohio-2179, at ¶ 20, quoting *Tewarson v. Simon,* 141 Ohio App.3d 103, 115, 750 (2001).

**{¶56}** Furthermore, "'[w]eight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the [trier-of-fact] that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."'" (Emphasis *sic*.) *Eastley*, at ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting Black's Law Dictionary 1594 (6th Ed. 1990).

**{¶57}** Finally, issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier-of-fact. *Seasons Coal Co. Inc. v.*

*Cleveland*, 10 Ohio St.3d 77, 80 (1984). Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does *not* translate to the record well." (Emphasis *sic*.) *Davis v. Flickinger*, 77 Ohio St.3d 415, 419 (1997). "'Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence.'" *In re A.B.*, 2022-Ohio-4234, ¶ 12 (3d Dist.), quoting *In re R.M.*, 2013-Ohio-3588, ¶ 55 (4th Dist.).

*Analysis – Decision Regarding Z.W.*
*(Case Number 5-24-18)*

**{¶58}** In this case, with regard to the first prong of the two-prong test, the trial court found by clear and convincing evidence that Z.W. had been in the agency's temporary custody for twelve or more months of a consecutive 22-month period. Under the plain language of R.C. 2151.414(B)(1)(d), when a child has been in an agency's temporary custody for twelve or more months of a consecutive 22-month period, a trial court need not find that the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. *In re I.G.,* 2014-Ohio-1136, ¶ 30 (3d Dist.), citing R.C. 2151.414(B)(1)(d); *In re A.M.*, 2015-Ohio-2740, ¶ 14 (3d Dist.).

**{¶59}** On appeal in Z.W.'s case, McKenna does not dispute that CPSU satisfied the R.C. 2151.414(B)(1)(d) "12 in 22-standard" as found by the trial court, a finding which is also supported by the record. Therefore, we move on to consider whether the trial court's best-interest of the child finding is also supported by clear and convincing evidence.

**{¶60}** At the May 13 and 14, 2024 hearing on the motion for permanent custody relating to Z.W., CPSU presented the testimony of six witnesses and introduced 27 exhibits, and McKenna introduced the testimony of four witnesses. The report of the guardian ad litem, attorney Timothy Hoover, was admitted into evidence as a court's exhibit.

**{¶61}** At the hearing, Hope Stanfield testified that she is employed by Open Arms in Findlay, working as the case manager at Harmony House. Through that employment, Stanfield became familiar with Z.W. and McKenna, as Harmony House was used for McKenna's supervised visitation with Z.W., as well as for McKenna's supervised visitation with several of her other children. Stanfield identified the records relating to McKenna's visits with Z.W., which included notations as to any cancellations or missed visits, as well as notes regarding any incidents occurring during the visits or rule violations. The records reflected that McKenna was very inconsistent in attending visits with Z.W. Due to missing scheduled visits, McKenna was twice suspended from visiting with Z.W., with those suspensions occurring in January of 2023 and October of 2023. Stanfield testified

about several instances where McKenna's supervision of Z.W. during the visits, as well as that of the other children, was inadequate and put Z.W. at risk of harm. Stanfield also testified about a recent visit where McKenna spent approximately twenty minutes paying no attention to Z.W., during which time McKenna also had her back turned to Z.W. Stanfield testified that, other than the noted instances of McKenna's failure to supervise Z.W., the visits seemed to go well.

{¶62} Amy Ward testified that she is employed as a family support coach at the Family Resource Center. In that capacity, Ward has worked with McKenna. For the most part, McKenna was consistent in attending her home coaching sessions with Ward, although there were times when the home coaching sessions were suspended due to McKenna not being involved in parenting her children. Ward testified that she made suggestions to McKenna to help improve her parenting skills and that McKenna followed through on the suggestions. Ward's testimony about some of the history in the case was vague, as her records were incomplete and she expressed confusion about some of the entries in the records. Ward testified that McKenna seemed to be bonded with Z.W. and the other children when she is with them. When asked about the recent visit at Harmony House during which McKenna ignored Z.W. for the first twenty minutes, Ward testified that it was odd.

{¶63} Jill Titus testified that she and her husband are foster parents who are also certified as "treatment level" foster parents, in order to provide foster care to children who have special needs and require additional care. Titus testified that Z.W. was just shy of two years old at the time of the hearing. When Z.W. was born, Titus and her husband were called and asked to provide foster care for the newborn. At that time, Titus and her husband were already fostering three of Z.W.'s half-siblings, C.P., J.P., and B.P. Titus was shocked when they received the call about Z.W. having been born because they had seen McKenna just a few months before and did not know she was pregnant. While Titus was not prepared to accept a baby into her home at that time, she and her husband agreed to take Z.W. Titus testified that Z.W.'s birth and her arrival in the Titus household was also a shock to C.P., J.P., and B.P. Titus explained that the three older children are very delicate and had not been prepared for a new sibling to come into the home. The Tituses subsequently cared for and raised Z.W. for the entirety of her young life, and she was doing well in their care.

{¶64} Titus testified that Z.W. is extremely smart and is a busy little girl who requires constant supervision. Because Z.W. is two and very active, she must be supervised at all times. Based on her prior experiences with McKenna, Titus expressed concern about McKenna's ability to properly supervise Z.W. Titus testified about an incident where Z.W. and the other children were visiting McKenna in her home, and B.P. broke the arm of another sibling when the children

were left unattended by McKenna. Titus also testified that there had been a number of times when she or her husband transported Z.W. to Findlay for a scheduled visit with McKenna at Harmony House and then McKenna failed to show up without explanation. At one point, when in-person visits with McKenna were suspended, Titus arranged video calls between McKenna and the children. Titus testified that McKenna did not ask many questions of the children during those calls, such as inquiring about their schooling or sports or other interests. Titus testified that, as to video calls between McKenna and Z.W., such calls would sometimes go well but that McKenna was disconnected and quiet and not interactive with Z.W. at other times. Titus testified that she terminated phone communications with McKenna after Titus's husband received two texts of photographs depicting McKenna topless. Titus and her husband reported the photos to CPSU and the police, deleted the texts, and then ceased further direct phone contact with McKenna. Titus testified that she and her husband are willing to adopt Z.W. if the motion for permanent custody was granted.

{¶65} Jenny Foster testified that she is employed by Hancock County Children Services, and that she had been involved in the case since Z.W.'s birth, although the agency had a prior open case with McKenna and her other children prior to Z.W. being born. The agency initially became involved with McKenna and her four other children due to concerns of drug use in the home, McKenna not having a stable home, the children being transported without car seats, and concerns

with McKenna's mental health and her ability to adequately supervise the children. Prior to Z.W. being born, the agency was not aware that McKenna was pregnant, as she had kept the fact of the pregnancy from the agency. When Z.W. was born, McKenna told the hospital that she had no supplies for the baby, such as diapers or formula. Foster testified that Z.W. was born preterm and the hospital was concerned over certain health risks and wanted the baby to stay in the hospital for observation. However, McKenna told the hospital that, while she had an open case with CPSU, she was permitted to take the baby home, which was not true. Later that night, McKenna attempted to leave the hospital with Z.W. against medical advice. At that time, the agency went to the hospital to attempt to work up a safety plan with McKenna, but McKenna was not willing to comply with the safety plan, and so law enforcement removed the child from McKenna and placed Z.W. into the agency's emergency care. A shelter care hearing was then held and Z.W. was found to be a dependent child, and Z.W. had remained in the custody of the agency since that initial removal.

{¶66} Foster testified that, during the time CPSU had been involved in the case, they had attempted to place Z.W. with three different family members, including her father, but none of those placements worked out for various reasons. Foster also identified the case plan where Z.W. was initially added to the case, as well as subsequent case plans where minor modifications were made. Foster testified that the case plans were designed to address the concerns

causing the removal of Z.W. from her mother, with the goal of reunification. Foster testified that McKenna initially engaged in mental health counseling and then even voluntarily continued treatment after completing the initial treatment goals. However, agency staff continued to have concerns with McKenna's depression and the fact it affected her motivation to properly supervise her children. Foster testified that McKenna maintained an apartment, but there were concerns about her permitting other persons to stay in the home who were not approved by the agency, as well as concerns resulting from injuries to the children that occurred due to not being properly supervised while visiting McKenna's home. Foster testified that despite McKenna completing a domestic violence victim's class early in the case, she then had another relationship with a person that resulted in domestic violence. McKenna completed a parent education course but the agency still noted difficulties with her parenting during visitation, and so home coaching was added in order to help her apply appropriate parenting strategies. Foster testified that, due to McKenna still struggling to implement such strategies, it was felt that McKenna did not successfully complete the home coaching. Foster was also not able to do unannounced visits at McKenna's home, as McKenna always said she was sleeping and did not hear the door, or would not respond to unannounced visitors. Foster testified that McKenna can do a great job when attending to one child at a time but, when faced with handling multiple children, she struggles to divide her attention in order to attend to the children and

ensure their safety. Foster testified that McKenna's visitation with Z.W. was also sporadic over the time the case was pending. At one point, McKenna went 166 days without visiting with Z.W. and McKenna was never able to progress to having unsupervised visitation with Z.W. Foster testified that Z.W. is a happy, easygoing child who is always excited to interact with anyone, including her mother.

{¶67} Foster further testified that Z.W. is in need of legally secure placement and that the same cannot be accomplished without permanent custody. Foster also testified that permanent custody was in Z.W.'s best interest. Foster testified that those opinions were based on the fact that McKenna failed to remedy the concerns that led to the agency's involvement with the family. While McKenna was always willing to attend sessions with service providers, she still nonetheless missed appointments that affected her progress on the case and, more importantly, she was not able to demonstrate changes in her behavior that related to her parenting. Foster also testified that permanent custody is the least restrictive alternative, particularly as Z.W. had been placed with the same foster parents since birth and does not identify anyone else, including McKenna, as being her parent or caregiver.

{¶68} Lexi Goedde testified that she is a CPSU caseworker with Hancock County, and had been the ongoing caseworker on the case since December of 2023. Goedde testified that the agency felt permanent custody of Z.W. was necessary due to the lack of significant progress in the case by either parent and because the child needs permanency. Goedde confirmed that the agency

unsuccessfully explored relative-placement for Z.W. and that the only family Z.W. had ever known is that of her foster parents. Goedde testified that the case plan she had authored in the case was designed with reunification as the goal and that all of the objectives in the case plan were reasonably within the capacity of the parents to complete. Goedde noted that a recent report from McKenna's mental health counselor reflected that McKenna was not improving. Goedde also noted her concern with McKenna's ability to safely supervise Z.W., and cited the recent visit where, for a significant period of time, McKenna was not observing the room or Z.W. Goedde noted that while McKenna was generally compliant with meeting with providers, she nonetheless still exhibited a lack of supervision toward the children. Goedde testified that McKenna has always been cooperative with her, but that McKenna failed to respond any time Goedde had attempted an unannounced visit at McKenna's home. Regarding McKenna's relationship with Z.W., Goedde testified that she had not observed a bond between them, beyond them just being familiar with each other. Goedde testified that Z.W. is in need of legally secure placement, which cannot be accomplished without permanent custody. Goedde also opined that it is in the best interest of Z.W. for her to be placed in the agency's permanent custody, as her biological parents have not demonstrated the ability to provide a safe and stable environment for her and because her foster family does provide such an environment. Finally, Foster testified that a grant of permanent custody is the least restrictive alternative.

{¶69} Kelli Miller testified that she is employed by Hancock County Children Services and served as the ongoing supervisor in Z.W.'s case. Miller testified that in October of 2023, McKenna had supervised visitation with Z.W. at Harmony House but, separately, three of McKenna's other children were permitted supervised visitation in McKenna's home. During one visit when the older children were there, it was reported that McKenna was watching television while the three older children were upstairs unattended. While the children were unattended, one of them was allegedly sexually assaulted by the other two. The agency suspended in-home visitations following that incident, although the assault allegations could not be substantiated by the agency's investigation. Miller testified that there is an extensive history of inappropriate sexual activities amongst the three older children and so it was extremely concerning that nobody was attending to the children while they were in McKenna's home, in order to prevent such things from occurring. Miller testified that, through most of the agency's involvement with the family, McKenna had maintained stable housing. However, every time the agency permitted the children to visit at McKenna's home, there was an issue, such as the children suffering injuries or the children being transported in vehicles without car seats. Miller also pointed to the recent visitation at Harmony House, just a week prior to the hearing, as an example of McKenna failing to interact with and supervise Z.W. Miller testified that, because Z.W. is only two years old, McKenna's failure to supervise the child is particularly concerning. Miller testified that Z.W. is in need

of legally secure placement, which cannot be accomplished without permanent custody. Miller testified that permanent custody is in Z.W.'s best interest, as she has been in foster care for essentially her entire life and neither parent in the case was able to adequately address the concerns in order to make reunification safe for Z.W. Miller is also an adoption assessor and she testified that Z.W. would greatly benefit from adoption. Miller testified that she believes there is a one hundred percent probability that Z.W. would be adopted.

{¶70} Jade McCloud testified that she is employed as a forensic counselor at the Family Resource Center, where she had been providing counseling services to McKenna for approximately two years. McKenna began the counseling due to the CPSU case, because she was trying to regain custody of her children. McCloud diagnosed McKenna with major depressive disorder, post-traumatic stress disorder, and adjustment disorder with anxiety. McCloud testified that McKenna had met her initial treatment goals and McCloud was ready to discharge McKenna from treatment but McKenna requested to continue the counseling. McCloud testified that McKenna had been consistent in her treatment and motivated in her counseling, however McCloud testified that they had never discussed parenting, parenting techniques, or parenting needs.

{¶71} Hope Stanfield, the case manager at Harmony House, was recalled to the stand and testified about the period of time in late 2023 when McKenna's visitation with Z.W. was suspended and did not resume for several

months. Stanfield testified that part of the delay in resuming McKenna's visitation with Z.W. was due to difficulty in working out a visitation schedule. Stanfield testified that part of that difficulty was due to McKenna not wanting to visit with Z.W. at a time separate from McKenna's visitation with her other children.

{¶72} Skylar Garza-Ellcessor testified that he has been a close friend of McKenna's since she was in fifth grade and he was in seventh grade. On one occasion during the pendency of the CPSU cases, Garza-Ellcessor served as the supervisor for a visitation that McKenna had with her children at her home. On that occasion, one of McKenna's daughters was injured as a result of fighting with another sibling over a scooter. Garza-Ellcessor testified that McKenna had stepped inside to get something and was busy tending to Z.W. but that he was keeping an eye on the other children outside when the scooter incident occurred. Garza-Ellcessor testified that the incident happened very quickly in the moment and that McKenna's children were very energetic at the time. Garza-Ellcessor also testified that he had observed McKenna's parenting over the years and he thinks she is a great parent.

{¶73} McKenna testified that she resides in Findlay, Ohio, where she had been living in her current home for approximately three years. McKenna testified that the biggest change she made as a result of the CPSU cases was that she had quit dating, as she makes poor choices in men and has more important things to focus on. As to the circumstances surrounding Z.W.'s birth, McKenna testified that she

did not hide her pregnancy from the agency but that she also purposely did not share the news of the pregnancy. McKenna testified that she had received prenatal care during her pregnancy with Z.W., although she did not know the name of the physician who delivered Z.W. After Z.W. was born, McKenna wanted to leave the hospital with the baby against medical advice. McKenna testified that she had developed Group B Strep during her pregnancy with Z.W., which was why the hospital wanted to keep Z.W. for observation following her birth. However, McKenna was familiar with Group B Strep from a prior pregnancy and had been told by doctors then that it was nothing to worry about. McKenna testified that CPSU personnel were very aggressive when they came to the hospital following Z.W.'s birth. McKenna testified that she refused to agree to a safety plan at that time on the advice of counsel.

{¶74} McKenna testified that her visitation with Z.W. was suspended the first time due to a miscommunication with the caseworker, as McKenna believed the Harmony House visitations were going to be switched to supervised in-home visits. McKenna testified that the second suspension of visitation occurred because she had been sick. McKenna testified that her employment obligations made it impossible for her to have visitation with Z.W. in the evenings, which was when Harmony House tried to schedule it. With regard to the recent visitation with her children when she ignored Z.W. for twenty minutes, McKenna testified that she was upset at that time, due to having realized that the permanent custody hearing was to

be held shortly thereafter. McKenna testified that she interacted with Z.W. towards the end of that same visitation, and acknowledged that she should have positioned herself differently in the room, so that she could observe all of the children.

{¶75} As to the incident where one of her older daughters was injured in a fight with a sibling over a scooter, McKenna testified that she had stepped into the house momentarily to get Z.W., whom she had left inside in a bouncer as a safety precaution because Z.W. was crawling at the time. With regard to her oldest daughter alleging that she had been sexually abused by two of her siblings while visiting at McKenna's home, McKenna testified that the family was in the car traveling for most of the day in question. McKenna testified that she had heard through the agency that her older children were engaging in sexual activity with each other but that she had never witnessed it and it took place when the children were visiting their father. With regard to the nude photographs of her that had been texted to Z.W.'s foster father, McKenna testified that her ex-boyfriend had stolen her phone and so she assumed he was responsible for sending the photos.

{¶76} McKenna testified that she had experienced difficulties dealing with CPSU throughout the pendency of the cases she had with them, and that the agency refused to provide her information about how the children were doing in school, refused to assist her in scheduling visitation, refused to give her medical information about Z.W., and refused to give her contact information for Z.W.'s foster family. McKenna testified that she felt she had completed everything required of

her by the case plan. McKenna testified that, in addition to the services suggested by the agency, she also watched a reality television show and TikTok videos in order to learn parenting techniques. McKenna testified that she did not believe permanent custody was in Z.W.'s best interest.

{¶77} At the close of the evidence, upon inquiry by the trial court, the guardian ad litem indicated that nothing he had heard during the hearing changed the recommendation made in the report he had submitted to the court. That report, which was admitted in evidence as Court's Exhibit A, recommended that the motion for permanent custody of Z.W. be granted.

{¶78} In the written decision issued by the trial court on May 28, 2024, the trial court reviewed the evidence presented at the permanent custody hearing in light of the best-interest analysis required by R.C. 2151.414(D) before determining that permanent custody of Z.W. should be granted to the agency.

{¶79} Following this Court's independent review of the record, we find that the trial court took all relevant evidence into account and properly applied the relevant statutory factors in making its "best interest of the child" determination. The trial court's decision was supported by clear and convincing evidence, and the weight of the evidence presented at the permanent custody hearing strongly established that a grant of permanent custody to the agency is in the best interest of Z.W.

{¶80} In particular, we note that Z.W. was born under circumstances reflecting that McKenna was not prepared, or equipped, for the baby's arrival. Even more troubling is the fact that, after hospital medical staff determined that Z.W. needed to remain in the hospital for observation, McKenna attempted to leave the hospital with Z.W. against that professional medical advice. In the nearly two years that followed, McKenna significantly failed to fully participate in the visitation opportunities made available to her and appeared to develop no real bond with Z.W. Most importantly, during the pendency of the case, McKenna continued to display conduct evidencing her inability to supervise and care for Z.W. in an attentive and safe manner.

{¶81} The factors that must be considered in determining whether permanent custody is in Z.W.'s best interest are set forth in R.C. 2151.414(D), as detailed above. In this case, the testimony was clear that Z.W. was thriving in her foster home and that she was bonded with her foster family. On the other hand, while Z.W. always seemed happy to see her mother, no real familial-type relationship had developed between the two. Regarding the wishes of the child, Z.W. is too young to express her own wishes. However, the guardian ad litem strongly opined that permanent custody was in Z.W.'s best interest. Regarding Z.W.'s custodial history and her need for permanency, Z.W. was almost two years old at the time of the hearing and had been in the temporary custody of the agency since shortly after birth. The evidence established that Z.W. certainly needs permanency and there

was no indication that Z.W. could safely be returned to her mother at any time in the near future. While McKenna was fairly compliant in participating in the services recommended by the agency in order to complete the objectives set forth by the case plans relating to Z.W., case plan compliance does not preclude a grant of permanent custody to a children's services agency. *E.g., In re Gomer*, 2004-Ohio-1723, ¶ 36 (3d Dist.). Further, while the evidence established that McKenna is employed and had housing suitable for Z.W., which are also factors to McKenna's credit, the remaining evidence overwhelmingly established that McKenna had simply not demonstrated the ability to provide a stable, safe, and nurturing environment for Z.W.

**{¶82}** Upon considering all relevant factors and remaining mindful that the trial court's judgment may have been based upon observing the demeanor of witnesses and other nuances that do not translate to the written record, we find that the trial court's decision regarding permanent custody of Z.W. was supported by clear and convincing evidence. For the reasons stated, and in light of all of the evidence detailed above, the trial court's decision granting permanent custody to the agency was not against the manifest weight of the evidence and McKenna's assignment of error relating to Z.W. is overruled.

*Analysis – Decisions Regarding C.P., B.P., and J.P.*
*(Case Numbers 5-24-19, 5-24-20, and 5-24-21)*

**{¶83}** In each of these three cases, with regard to the first prong of the applicable two-prong test, the trial court found that the child at issue had been in the agency's temporary custody for twelve or more months of a consecutive 22-month period. Again, under the plain language of R.C. 2151.414(B)(1)(d), when a child has been in an agency's temporary custody for twelve or more months of a consecutive 22-month period, a trial court need not find that the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. *In re I.G.*, 2014-Ohio-1136, ¶ 30 (3d Dist.); *In re A.M.*, 2015-Ohio-2740, ¶ 14 (3d Dist.).

**{¶84}** On appeal, none of the appellants dispute that CPSU met the R.C. 2151.414(B)(1)(d) "12 in 22-standard" as to all three children, and the trial court's findings as to that issue are also supported by the record. Therefore, we move on to consider whether the trial court's best-interest of the child findings are also supported by clear and convincing evidence.

**{¶85}** On May 20 - 23, 2024, a hearing was held on the motions for permanent custody relating to C.P., J.P., and B.P. At that hearing, CPSU presented the testimony of twelve witnesses, McKenna called three witnesses, and Johnathon presented the testimony of one witness. Over 130 exhibits were also entered into evidence.

**{¶86}** Jena Meloy testified that she is a kindergarten teacher employed by the Findlay City Schools. Two years prior to the hearing, J.P. was a student in

Meloy's kindergarten class. On October 25, 2021, Meloy noticed a bruise on J.P., which she asked him about and also reported to the school nurse. The nurse then telephoned either children services or the police to report the injury.

**{¶87}** Ashley Brauneller testified that she is a school nurse employed by the Findlay City Schools. In October of 2021, teacher Jena Meloy brought J.P. in to see Brauneller, because Meloy noticed that J.P. had a large bruise on his right back hip that extended down his backside. Brauneller asked J.P. what had happened and he said he had been hit by his dad the night before. Brauneller, who is a mandated reporter, provided J.P. with an ice pack and called law enforcement.

**{¶88}** Officer Doug Marshall testified that he is a police officer employed by the Findlay Police Department. On October 25, 2021, Marshall responded to Whittier Primary School, as a result of a call reporting possible child abuse. After speaking with J.P. and looking at his injuries, Marshall contacted CPSU. Marshall filled out the paperwork to do an emergency child removal, and then J.P. and his brother C.P. were removed from the school and placed in protective custody with CPSU. Marshall then went to Johnathon's residence and removed the boys' sister, B.P. While at the residence, Marshall spoke with Johnathon. Johnathon told Marshall that the kids were not listening and would not go to bed, and so he "whooped ass." (Tr., 63).

**{¶89}** Hope Stanfield testified that she is employed by Open Arms in Findlay, as the case manager at Harmony House. Through that employment,

Stanfield became familiar with C.P, J.P., B.P., and their parents, as Harmony House was used for Johnathon's and McKenna's supervised visitation with the children. Stanfield identified the records relating to those visitations, which included notations as to any cancellations or missed visits, as well as notes regarding any incidents occurring during the visits. As to Johnathon's visits, the records reflected that the children were frequently rambunctious, would throw things, and would kick and hit each other. Johnathon would typically address the children's misbehavior in an appropriate fashion, although not always successfully. Johnathon missed some scheduled visits but never two in a row, which would have resulted in his visitation being suspended pursuant to Harmony House rules. Stanfield testified that the two boys were affectionate toward their father, appeared to enjoy visiting with him, and seemed bonded with him. As to McKenna's visits, the records reflected that the children would also misbehave in similarly rambunctious ways, or speak very disrespectfully toward their mother. J.P. frequently expressed a desire to cut short the visits with his mother or to not attend them at all. While McKenna would sometimes try to correct the children when they acted out, there were visits where McKenna failed to respond to the children or did not pay them close attention. McKenna also missed enough visits that her visitation was suspended three different times. McKenna also cancelled a number of visits, giving a variety of reasons as to why she could not make it.

{¶90} Antonique Ingraham testified that she is a Clinical Counselor II for the Cullen Center, which is associated with the Russell J. Ebeid Children's Hospital, formerly known as Toledo Children's Hospital. In that capacity, Ingraham counseled B.P. for approximately one month in the fall of 2023, during which time there were approximately eight counseling sessions. B.P.'s counseling sessions were set up by Johnathon, following a referral by CPSU for trauma-involved therapy. Johnathon and his mother, Nancy, reported that B.P. exhibited inappropriate behaviors, including sexual behavior, with the other children, and she had problems regulating her emotions at home and at school. B.P. reported to Ingraham that she and her brothers engaged in sexual behavior, which B.P. called "pee-peeing". B.P. said that her brother put his "pee pee" in her vagina. Ingraham diagnosed B.P. with PTSD, with the nature of the trauma being neglect, emotional abuse, removal, and family loss. During the timeframe that Ingraham saw B.P. for counseling, B.P. was not on any medication. B.P. reported that she "loved mommy." However, B.P. also told Ingraham that her mother was rude and B.P. said she hated going to the "stupid visits" with her mother. B.P. also reported that McKenna's friend "Nate" had kept B.P. and another sibling in a dark room, would tie them up in the closet, would not feed them, and would not let them use the bathroom. During the eight counseling sessions, B.P. never said anything negative about Johnathon. On October 5, 2023, B.P. was removed from her father's care by

CPSU, and Ingraham's counseling services were thereafter terminated by the agency.

**{¶91}** Michelle Yeasting testified that she is employed as the Forensic Nurse Program Coordinator at Blanchard Valley Health System. Yeasting is a trained sexual assault nurse examiner ("SANE") and is also a pediatric SANE. On October 3, 2023, B.P. was brought to the hospital for a sexual assault exam. Yeasting obtained a history from B.P.'s father, and then she also spoke with B.P. The chief complaint reported by Johnathon was that B.P. had told her counselor that one or both of her brothers had recently sexually assaulted her, during what was supposed to be a supervised visit at McKenna's home. Johnathon reported that there may have been penetration, and that he noticed two bruises on B.P.'s leg. Johnathon also reported that his mother, B.P.'s grandmother, noticed that B.P. had been itching her pelvic area. No sexual assault test kit was utilized during the examination due to the reported timeframe of when the alleged sexual assault had occurred. During the overall examination of B.P., Yeasting noted an abrasion on B.P.'s nose, a bruise on her right cheek, an abrasion on her neck, multiple abrasions on her back, a bruise on her right arm, three abrasions on her upper left arm, a bruise on her left foot, and an abrasion on her right foot. Yeasting also documented that B.P. had multiple lineal abrasions on her right upper thigh, and multiple abrasions on her buttocks. The examination of B.P.'s genital area reflected no unusual injuries, although Yeasting testified that such a finding does not rule out sexual assault.

{¶92} Jade McCloud testified that she is employed as a forensic counselor at the Family Resource Center in Findlay, where she had been providing counseling services to McKenna for two years. McKenna reported to McCloud that she was dealing with some mental health issues as a result of her children being removed from the home. McCloud diagnosed McKenna with post-traumatic stress disorder, adjustment disorder, and major depressive disorder. McCloud testified that McKenna had been meeting treatment goals and that should result in McKenna being better equipped to handle her stressors in the future. However, McCloud also testified that she and McKenna had not discussed parenting in the counseling sessions.

{¶93} Amy Ward testified that she is employed as a family support coach at the Family Resource Center. In that capacity, Ward has worked with Johnathon and McKenna. As to Johnathon, Ward reengaged with him in January of 2023. At that time, Ward noted that Johnathon seemed optimistic about learning new parenting skills. However, in February of 2023, Johnathon missed all four of the scheduled appointments made for that month. In March of 2023, Johnathon kept both of two scheduled appointments. Ward noted that, at that time, Johnathon seemed to understand that physical punishment of the children is unacceptable and he was learning new ways to discipline. Ward testified that physical punishment was a conversation topic during her sessions with Johnathon because that had previously been an issue. In April of 2023, Johnathon kept one scheduled appointment but was

a "no show" for his second one. In May of 2023, Johnathon kept both of his two scheduled appointments, and took Ward's suggestion concerning moving furniture at home to lessen his daughter's nighttime anxiety and help her sleep better. In June of 2023, Johnathon kept three of four appointments, during which Ward explained the harm in Johnathon coaching the children to cover up the truth, or asking them to lie. In July of 2023, Johnathon kept his only scheduled appointment, during which Ward counseled him about refraining from discussing CPSU case details in front of the children, which he had reportedly done. In August of 2023, Johnathon kept four of four appointments. Ward's notes indicated that Johnathon's home in Pemberville had been approved by CPSU, and that she continued to instruct him that his discipline of the children needed to be consistent, nonthreatening, and non-physical. In September of 2023, Johnathon kept two of two appointments. During one of those appointments, Johnathon reported that the children were getting injured during visitation with their mother. In October of 2023, Johnathon kept one appointment, but then Ward cancelled the second one after the children were removed from Johnathon's care by CPSU. Ward spoke with Johnathon and she recommended a one to two time per month check-in with her, in order to discuss any changes in the CPSU case status. During that conversation, Johnathon asserted that he had not harmed the children and alleged that all negative events occurred while they were in their mother's care.

-47-

{¶94} Ward testified that in December of 2023 and January and February of 2024, Johnathon did not engage in the recommended monthly check-ins, reporting to Ward that he felt home coaching was unnecessary because the children had been removed from his care. Johnathon subsequently reengaged with Ward, and began keeping appointments and she began observing Johnathon's parenting time with the children at Harmony House. Following one of those observed visitations, Ward spoke with Johnathon about internet safety, as there was an incident at Harmony House where Johnathon attempted to provide one of the children with a gamertag. That was a violation of CPSU rules as it would have provided the children with a form of communication over the internet that could not be monitored by the agency. Ward also discussed Johnathon's reluctance to co-parent with McKenna, which he felt that he could not do. Ward and Johnathon also discussed the pros and cons of Johnathon not allowing a CPSU caseworker into his residence, which Johnathon was resistant to doing because the children were not living in his home at the time. When Ward was asked if she believed the children would be safe in a home with Johnathon, Ward testified, "I don't think that I can answer that." (Tr., 434).

{¶95} As to McKenna, Ward testified that McKenna was fairly compliant with keeping her appointments, although there were months when appointments were missed or cancelled. Over time, Ward counseled McKenna on the potential harm that could be caused to the children by McKenna letting other people live in

her home. Ward also discussed with McKenna the need to pay very close attention to her children at all times, due to allegations of injuries happening to the children during McKenna's parenting time. Ward also discussed internet safety with McKenna, as it related to the children.

{¶96} Finally, Ward testified that she had observed both Johnathon and McKenna separately interact with the children three or four times each. Ward did not observe any discipline issues during those interactions, and both parents appeared to show love and affection toward the children.

{¶97} Jill Titus testified that she and her husband are foster parents and are also certified as a "treatment level" foster home, in order to provide foster care to children who have extra special needs. C.P., J.P., and B.P. were placed with Titus and her husband in October of 2021. Titus fostered all three children in her home for approximately two years, and then subsequently fostered only B.P. Titus testified that when the children first came to live in her home, they were very wild and "animalistic", running around, and picking up animals and flinging them. Titus testified that, due to the children's trauma history, they each behaved differently and navigated their issues in different ways. When not well regulated, C.P. would freeze, then shut down and not respond. The biggest concerns with C.P. were peer relationships and school-related matters. Titus testified that J.P. is impulsive and would not make safe choices when not well regulated. He would take off running

through parking lots and act in wild ways.  Titus testified that B.P. is a fighter, and would be very physical, destructive, and verbally abusive when not well regulated.

**{¶98}** Titus testified that, initially, it was very difficult to care for the children.  C.P. was behind academically, and had bullying issues that needed addressed.  Titus arranged for C.P. to be assessed by a psychologist at Nationwide Children's and he was diagnosed with ADHD.  J.P. had serious behavioral issues.  He was in kindergarten when first placed with Titus, and would clear classrooms with his destructiveness and would intentionally defecate himself.  Titus also had J.P. assessed by the psychologist at Nationwide Children's, and J.P. was also diagnosed with ADHD.  B.P. was in preschool when first placed in the Titus home.  B.P. was physical with the other children at preschool and destructive in the classroom, which resulted in her being suspended and then expelled from preschool.  Titus arranged for B.P. to be assessed through Mary Rutan Pediatrics, and B.P. was also diagnosed with ADHD.

**{¶99}** Titus testified that, after those diagnoses, each child was prescribed a different level of methylphenidate, which is a drug for treating ADHD.  Once the children began taking the medication, they were all monitored through regular consultations with Mary Rutan Pediatrics, to ensure there were no side effects and that things were going well. Titus testified that the difference in the children's behavior after being on the prescribed medication was life changing.  C.P. had initially been almost two years behind academically and, after his treatment began,

he was able to reach his current grade level in all areas. The medication also helped C.P. significantly with his peer relationships, he gained confidence, and his tendency to freeze and shut down lessened. Once on the medication, J.P. was like a different child, and no longer had behavioral problems in the classroom at school. B.P. also responded positively to the medication, and her behavioral issues improved. Due to a methylphenidate shortage, the children's prescription regimen was interrupted on one occasion because their prescriptions could not be filled. Titus testified that on that occasion, once the children were not taking the medication, there was an immediate change for the worse in the children's behavior, particularly at school. Titus testified that even missing just one dose of the medication, which is taken daily in the morning, would cause an immediate change in the children's behavior.

{¶100} Titus testified that, during the time she had all three children in her household, it was important to set strict boundaries for the children's safety, due to their past history with each other. Titus enforced strict rules, and the children were not permitted to be left unattended, nor were any two children permitted to be together without supervision.

{¶101} While all three children were in Titus's care, visitation with their parents began in West Liberty, where the Titus and her husband live. Both parents were inconsistent in their attendance. To make visitation easier for both Johnathon and McKenna, the visitations were then moved to the Findlay area. Zoom calls were

also utilized as a way for the children to visit with their father. For a period, visitations with the parents were suspended. During that period, Titus noticed that the children were much calmer. Once visitation with their parents resumed, the children's behavioral issues increased. The more parental visitation was increased, the worse the children's behavior became, particularly when the children would have overnight visits or weekend stays with Johnathon. Titus also realized that Johnathon was not consistently administering the ADHD medication to the children, which Titus would provide to Johnathon prior to each visitation in his home and then inventory afterward. Following unsupervised weekend visits with Johnathon, C.P. and J.P. would become very physical with B.P., and would hit, shove, and gang up on her. The two boys would also increase their attempts to persuade B.P. to engage in sexual activity with them, and J.P. began defecating in the yard again, which he had not done since first coming to live with Titus. Titus attempted to explain to Johnathon the differences she observed in the children's behavior following visits with him, and she learned that Johnathon did not share her view as to the importance of the medication. Titus testified that Johnathon did ask her for advice, and she provided him with information about the structured approach she utilized in caring for the children in her home.

{¶102} Titus testified that, during the time she had all three children in her home, they suffered no injuries aside from those occurring from typical outdoor play. However, when the children began having extended visitation with Johnathon

in his home, Titus observed the children to have bumps and bruises, which Titus documented with photographs and reported to CPSU.

**{¶103}** Titus testified that she had far less contact with McKenna during the time Titus was fostering all three children, although she would speak briefly with McKenna when dropping off the children for visitation and they occasionally exchanged texts, sharing photographs of the children. Titus quit texting McKenna after McKenna texted two photographs to Titus's husband. Those photos depicted McKenna topless, in provocative poses. McKenna then texted again to say the texts had been sent to the wrong number. Titus and her husband reported the photos to CPSU and the police, and then ceased further contact with McKenna.

**{¶104}** Titus testified that, in August of 2023, the children were returned to Johnathon's custody. In October of 2023, B.P. was returned to Titus's care. At that time, Titus observed that B.P. "did not come back the child that left a month prior." (Tr., 502). When B.P. was returned to foster care in Titus's home, B.P. was not medicated, was very detached, and used inappropriate language.

**{¶105}** Titus also testified that, prior to the time when B.P. was separated from her brothers and cared for in a different home, B.P. disclosed to Titus that she and her brothers would "marry" each other. The boys would get on top of B.P. and also expose themselves to her. While all three children were still in her care, Titus stopped a sexual incident from occurring in a toy tunnel in her home. Titus testified

that all three children had disclosed the fact that they had previously had sexual encounters with each other.

{¶106} In summary, Titus testified that the three children have extreme needs, which include an experienced and regulated caregiver who can assist the children in navigating their issues and behaviors. Additionally, the children need to be monitored at all times. Titus testified that she would have serious concerns if B.P. were to be placed back with her brothers, given the history of behavior amongst them. Titus testified that the children need to be on medication, which has made such a significant improvement in their relationships and their behavior. Titus testified that the children need safe adults who can model the behavior that the children need to show. Finally, Titus testified that she and her husband adopting B.P. is a possibility.

{¶107} Skylar Garza-Ellcessor was called as a witness by McKenna, out of order. Garza-Ellcessor testified that he is a close friend of McKenna's, and has been for eight to ten years. On one occasion, Garza-Ellcessor served as the supervisor for a visitation that McKenna had with her children at her home. On that occasion, two of McKenna's girls fought over a scooter in the driveway, and one ended up with a broken wrist. Garza-Ellcessor believed that it was B.P. who pushed another sister, with the other sister being the one who got hurt. Garza-Ellcessor also testified that he had previously been around C.P., J.P., and B.P., and that the three of them

sometimes played rough and would have bruises on them, but Garza-Ellcessor had never seen anyone abuse the children.

{¶108} Jenny Foster testified that she is employed by Hancock County Children Services, and she was the ongoing caseworker in this case from May of 2022 until October of 2023. CPSU involvement in the case began in January of 2021, when the children lived with McKenna, and McKenna's boyfriend overdosed at her home when the children were there. In addition to receiving a report about that incident, CPSU received reports of domestic violence occurring in the home, and it was alleged that McKenna was using drugs. CPSU attempted to investigate, but McKenna would not cooperate. McKenna was subsequently hospitalized after a domestic violence incident involving the same boyfriend who had overdosed. CPSU developed a safety plan, which McKenna refused to sign. Within days of discussing the safety plan with CPSU, McKenna broke the terms of the plan. In February of 2021, CPSU received a report of bruises on the children, and the children were removed from McKenna at that time. McKenna again refused to sign a safety plan and would not cooperate with the agency. C.P., J.P., and B.P. were adjudicated to be neglected and dependent children. At the dispositional hearing, custody of the three children was given to Johnathon, with the agency having protective supervision. In October of 2021, the children were reported to have bruises, and it was alleged that Johnathon had inflicted the injuries. At that

time, the police removed the children and placed them into the custody of the agency.

{¶109} Foster testified that, on October 14, 2022, the agency filed its first motions for permanent custody of C.P., J.P., and B.P., as McKenna had not made progress with her case plan, her visitation with the three children was inconsistent, and she had hidden a pregnancy from CPSU, then gave birth and attempted to leave the hospital with the newborn against medical advice. At that time, Johnathon was only visiting with the children via video, and also was not making progress with the case plan. Following mediation, which Johnathon attended but McKenna did not, a consent agreement was reached. Pursuant to that agreement, the permanent custody motion was withdrawn by the agency, and CPSU sought a six-month extension of its temporary custody of the three children, which the trial court granted. As part of the agreement, Johnathon was given increased parenting time, as he seemed to be making progress on the case at that time.

{¶110} Foster testified that, on June 22, 2023, the agency filed a second set of motions for permanent custody of C.P., J.P., and B.P. At that time, there were concerns because Johnathon was taking the children to an out-of-town home that was not an approved location for his visitation. Additionally, there were concerns that Johnathon was coaching the children as to what to say and how to act when interacting with agency personnel. McKenna was also not making progress with her case plan, and so the agency felt it was time to file again for permanent

custody. In July of 2023, a hearing was held on a motion filed by Johnathon seeking increased parenting time. As a result, the trial court permitted unsupervised visitation between Johnathon and the three children to continue. On August 23, 2023, CPSU and all other parties signed a consent entry that returned the three children to Johnathon's custody, with protective supervision retained by the agency, upon the terms and conditions set forth in the agreed order. As part of that agreement, CPSU also withdrew the pending motion for permanent custody.

{¶111} Foster testified that, on October 5, 2023, an ex parte motion requesting removal of the children from Johnathon's custody was filed by the agency, as it had been reported that B.P. was sexually assaulted during a visit at McKenna's house, and there were numerous bruises and marks found on B.P. that had not been reported to the agency as required by the court order in place at that time.

{¶112} Foster testified that, on October 6, 2023, the agency filed its third set of motions seeking permanent custody of C.P., J.P., and B.P., as the children had been removed twice from Johnathon's care, and the case had been opened for over two years with no additional time left to attempt to reunify the family.

{¶113} Foster testified that a grant of permanent custody was the least restrictive alternative for the three children, as the children need a permanent, safe and secure home that is free from abuse and neglect. CPSU explored three relatives

as custodial options for the children; however, those relatives either were not approved or declined to take the children.

{¶114} Foster identified various case plans that had been developed over the pendency of the agency's involvement with the family, and she detailed changes that had been made as the family's situation evolved. Throughout the agency's involvement with the family, reunification had been the goal of the case plans, and services were identified and offered to the family in order to help them address and remedy safety concerns.

{¶115} As to Johnathon, Foster testified that the case plans included completing a GAINS assessment, following recommendations, mental health services, completing parent education, providing safe and stable housing, and utilizing home coaching. Johnathon completed the parent education class but, through visitation, CPSU saw problems with his ability to implement the strategies learned in the parent education, which was why the agency recommended home coaching. Johnathon's compliance with home coaching was mixed. Ultimately, Johnathon did not demonstrate effective parenting strategies. With regard to housing, Foster testified that Johnathon initially remedied concerns raised by the caseworker, such as weapons being displayed on the wall or a closet door being off its track. However, toward the end of Foster's involvement in the case, Johnathon moved to a different house, denied Foster access to the home, and he permitted the children to be at the new home without agency approval. Two allegations of

physical abuse occurring in Johnathon's home resulted in removal of the children, indicating he was not able to provide a safe and stable home for them. Johnathon eventually engaged in mental health services but, to Foster's knowledge, he then did not follow through on additional mental health services recommended by the family therapist. Results of the GAINS assessment requested by CPSU were not received by the agency until February of 2023. Additionally, Foster testified that Johnathon was initially cooperative with her but, by the spring of 2023, he became very frustrated and angry when progress was not made on the case according to his own desires and timeframe. Foster testified that she would characterize Johnathon's relationship with the children as manipulative. Based upon staff observations of Johnathon's interaction with the children during supervised visitations, the agency had concerns with his ability to attend to all three children at one time, and also with the ineffectual way he addressed the children's behavioral issues.

{¶116} As to McKenna, Foster testified that the case plans focused on domestic violence issues, parent education, home coaching, mental health services, safe and stable housing, and visitation. McKenna completed domestic violence counseling but continued to have issues with domestic violence in her relationships. McKenna's attendance with her mental health provider was sporadic, although she continued with that counseling. McKenna struggled with depression and with finding the motivation to follow through with recommendations made to her by the agency. With regard to housing, McKenna initially lived in an unsafe

structure but then moved to a different home that was in much better condition. However, the agency continued to have concerns with other adults that McKenna permitted to be in her home, as the presence of others impacted her ability to establish a safe home environment for her children. McKenna completed parent education, but continued to struggle with adequately supervising her children. At the agency's request, McKenna also engaged in home coaching. While she had some attendance issues with the home coach, McKenna continued to meet with that coach throughout the pendency of the case. McKenna's supervision of the children in her home did not improve over time, and the lack of supervision resulted in a child being injured and requiring medical treatment on one occasion, and in a sexual assault against one of the children reportedly occurring in her home on another occasion. During McKenna's supervised visits with the children at Harmony House, it was also noted that she failed to attend to the children, and could not ensure their safety. McKenna was defensive and uncommunicative with Foster in their dealings. McKenna was inconsistent in attending visitation with the children. Foster testified that while McKenna loves the children and the children love their mother, McKenna was ultimately just not able to adequately supervise the children in a manner that would keep them safe. Over time, C.P., J.P., and B.P. began to express frustration over having to visit their mother at Harmony House. More recently, J.P. began stating that he did not want to see his mother on

a weekly basis. At the time of the hearing, there was a "no visitation" order in place with regard to McKenna and B.P.

{¶117} Finally, Foster testified on direct examination that the three children were in need of a legally secure placement and that such a placement could not be accomplished without a grant of permanent custody to the agency. Foster also opined that permanent custody would be the least restrictive alternative available.

{¶118} Under cross-examination, Foster testified that there had been twelve different case plans, although the main goals of the plans had remained the same. Foster agreed that Johnathon had completed most of the case plan requirements. However, she explained that he did not remedy the issues that had caused the removal of the children. Foster clarified that she did not expect a parent to be able to give one hundred percent attention to each child, but that it was important for a parent to know where the children are and what they are doing on a consistent basis. When questioned about a sword that Johnathon formerly had hanging on a wall in his home, Foster confirmed that it was at a height where the children could reach it. Foster testified that Johnathon stated he did not want his children on ADHD medication, and he also discontinued the children's use of the medication when in his custody or spending overnight visitations with him. Foster testified that Johnathon took the children off the medication in the absence of any doctor's recommendation to do so. Foster confirmed that McKenna had ended relationships with two abusive boyfriends. However, Foster testified that McKenna

continued to have multiple persons frequently present in her home and, while McKenna denied that those persons were living there, there was evidence that at least one man had been spending the night and it was unknown whether he was an appropriate person for the children to be around. Foster testified that McKenna, similar to Johnathon, had engaged in many of the services recommended by the agency but that she was unable to remedy the concerns of the agency and effectively and safely parent the children. Foster confirmed that McKenna has six biological children and, at the time of the hearing, had custody of none of them. Foster detailed various sexual behaviors that B.P. had engaged in, including masturbating, sticking a pencil in her vagina, and participating in sexually-oriented activities with C.P. and J.P. Foster noted that such behavior by B.P. lessened while she was in foster care but resumed after B.P. was returned to her father's custody. Foster testified that B.P. is a very traumatized child and that it will take a lot of work and specialized help to get her to a healthy place. Foster opined that B.P. should never be in a home again with C.P. or J.P. Foster acknowledged that she was removed from the case as the ongoing caseworker in early October of 2023, due to her becoming emotionally involved and potentially losing objectivity. Foster was not involved in the agency's decision to remove the children from Johnathon's custody later that month. Finally, Foster testified that she believed both McKenna and Johnathon to be unfit parents of the three children at issue in the case.

{¶119} Lexi Goedde testified that she is employed by Hancock County Children Services and was assigned in December of 2023 as the ongoing caseworker in the cases involving C.P., J.P., and B.P. Goedde testified that the agency filed the permanent custody complaints at issue due to the lack of significant progress on the part of either parent to remedy the concerns involved in the earlier removals, as well as other agency concerns. Goedde testified that she believed permanent custody to be the least restrictive alternative due to the children needing permanency and the lack of progress of the parents on the case plan objectives. Reunification was the ultimate goal of the case plan authored by Goedde with assistance from her supervisor, and Goedde testified that the plan was reasonably calculated to accomplish that goal. Changes made to that case plan included additional services, a change in placement that returned the three children to foster care, and the addition of Nancy Pfeiffer, Johnathon's mother, to the plan. Pfeiffer was added because she owned Johnathon's home and was in the home. Pfeiffer did not engage in any of the services recommended by the case plan and did not cooperate with CPSU. When contacted by telephone by CPSU, Pfeiffer hung up.

{¶120} Goedde testified that the objectives for McKenna in the case plan were mental health counseling, medication management, safe and stable housing, home coaching, and parent education. Records from McKenna's mental health counselor indicated that McKenna had been compliant with the counseling throughout the case but was not improving. Goedde completed home visits at

McKenna's residence and found the house to be maintained and structurally safe. However, Goedde noted that any time visitation had been enlarged to permit McKenna to visit with the children in her home, the visits were always terminated due to safety concerns resulting from lack of parental supervision. Goedde testified that McKenna also continued her pattern of allowing persons to be present in her home in significant ways without the agency having conducted background checks on those persons. McKenna completed parent education classes but her involvement with the home coach was inconsistent. A video from a supervised visitation occurring on May 8, 2024 reflected that McKenna was attentive to one of the children present at the time, but not another child who was in the room, with her back turned toward that child. Goedde testified that communication with McKenna was not the easiest, particularly when discussing the case plan or things that had happened to the children, because McKenna would tend to minimize the issue or blame other people. In any unannounced home visits made by Goedde to McKenna's home, the door went unanswered. Goedde confirmed that McKenna has six children, with C.P., J.P., and B.P. being the first, third, and fourth by birth order. McKenna did not have custody of any of those six children at the time of the hearing. Goedde also testified that, at the time of the hearing, C.P. still willingly attended visits with his mother, J.P. had begun refusing to attend visits with her, and B.P. had no visitation with McKenna pursuant to court order. Goedde testified that

there did not seem to be any significant bond between McKenna and any of her children.

**{¶121}** Goedde testified that objectives for Johnathon in the case plan were to reengage in mental health counseling, safe and stable housing, visitation, and home coaching. Goedde testified that Johnathon told her he would not reengage in mental health treatment as he had engaged in mental health services twice previously and felt he did not need it. With regard to housing, Johnathon permitted Goedde to visit him at his home in December of 2023 but, after that, it became difficult for her to schedule home visits and he refused to meet with her in his home. Johnathon also reported to Goedde that he had been terminated at his place of employment. Goedde testified that Johnathon had just completed a second parenting class the week before the hearing, with positive feedback from the provider. However, Goedde testified that Johnathon had not shown, or the agency had been unable to monitor, whether Johnathon was able to implement what was taught in the class. Johnathon declined to participate further with home coaching, telling Goedde that he did not see the point since the agency had already made up its mind. Goedde testified about various ongoing concerns of the agency with regard to Johnathon, including physical abuse and anger management issues. Goedde indicated that Johnathon tended to minimize those concerns or blame others.

**{¶122}** Goedde testified that CPSU had made reasonable efforts in the case, but that she believed a legally secure placement for the three children could not be accomplished without a grant of permanent custody to the agency. Goedde believed that it was in the best interest of the children to be placed in the agency's permanent custody, and that to do so was the least restrictive alternative. Goedde reiterated that neither parent had made significant progress in remedying the causes of the children's removals or in addressing the agency's concerns. Goedde testified that C.P. and J.P. had more recently been living in a foster home separate from B.P.'s foster home, and Goedde had observed that the boys really seemed to love their new home. Goedde testified that she observed the two boys showing respect to their foster mother and that the foster mother had reported that the boys were doing very well, mainly staying out of trouble, and needed just a little extra direction at times. Goedde testified that B.P. calls her foster parents "mom" and "dad" and that B.P. has never inquired of Goedde about McKenna or Johnathon.

**{¶123}** Under cross-examination, Goedde testified that she was permitted to form her own opinions on the case. She explained that while she was assigned to the case in December of 2023, the case plan she developed was not implemented until March 1, 2024 due to the removal in October of 2023 having been contested and the agency awaiting a disposition on that. Goedde acknowledged that, had Johnathon reengaged in mental health counseling, it probably would not have been completed by the hearing but that reengaging with counseling would indicate he

was making an attempt. Goedde testified that Johnathon would not acknowledge prior injuries reported by the children. Goedde testified that she would never suggest that a child call their foster parents "mom" and "dad", but that she was comfortable with that and it was not uncommon, especially if there are other children in the foster home using those terms. Goedde acknowledged that the children seem to have a bond with their father but not a good relationship, based on the fact the children appear to fear Johnathon. Goedde testified that the foster home where C.P. and J.P. were living was about three hours away, which contributed to the children not wanting to make the drive for visitation with their parents. Goedde testified that the case plan was not calculated for Johnathon to fail, and that the agency continued to work toward reunification even after the pending motions for permanent custody were filed. Goedde testified that the agency still encouraged visitation with McKenna, although she had been told that in-home visitation was not an option due to the pending motion for permanent custody and lack of appropriate supervision. Goedde testified that the case had been ongoing for thirty-nine months. Goedde testified that B.P. was also doing well in foster care, still living in the Titus home where she had been placed for a substantial part of her young life. At the time of the hearing, B.P. was engaged in ongoing counseling, as were C.P. and J.P. Goedde testified that the children had suffered a great deal of trauma in their early lives and, in her conversations with Johnathon, he tended to minimize the trauma suffered by the children.

**{¶124}** Kelli Miller testified that she is employed by Hancock County Children Services, where she is an ongoing supervisor and adoption assessor. Pursuant to that employment, Miller was involved in the cases involving C.P., J.P., and B.P. as an ongoing caseworker, then as a supervisor, and also as an adoption assessor. Miller testified that the original report that caused the agency to open the cases involving C.P., J.P., and B.P. was received in February of 2021. That report involved allegations of a drug overdose and domestic violence occurring in McKenna's home. When Miller responded to McKenna's house following a call from law enforcement, Miller observed all three children to have unexplained bruises on their faces, and a safety plan was put in place. The first removal of the children occurred while they were in McKenna's custody, and then a second removal took place when Johnathon had custody. Both removals involved the children having unexplained injuries. In October of 2023, after B.P. was found during a hospital S.A.N.E. exam to have a number of bruises all over her body, Miller believed the bruising was consistent with child abuse. The agency made substantiated findings during its investigation that Jonathon was the perpetrator. Johnathon appealed that decision, but it was upheld. Miller also detailed an unusual number of other injuries, such as bruises, cuts, scratches, and scrapes, suffered by the children over time when in Johnathon's care or during visitation with McKenna. Miller testified that, during the course of the agency's involvement with the case, Johnathon would claim that the injuries to the children

occurred when they were with McKenna, while McKenna claimed the children's injuries occurred when they were with Johnathon. The two parents also typically asserted that they did not know how the children's injuries occurred. Miller also testified concerning Jonathon's refusal to administer the prescribed ADHD medication, and the negative impact that the lack of medication had on the children.

{¶125} Miller further testified that the agency never stopped trying to reunify the children with their parents, even while the motions for permanent custody were pending. Miller testified that the agency made reasonable efforts toward reunification, which included providing case management, case plans, visitation, home coaching, mental health and substance abuse assessments and counseling, parent education, relative searches, return of the children, and protective supervision. Miller testified that the children need a legally secure and safe permanent placement, that permanent custody to the agency is in their best interests, and is the least restrictive alternative. Miller testified that the children have been removed three times during the pendency of the case, no relatives were approved for custody, and McKenna and Johnathon both failed to remedy the reasons for the removals. Miller testified that, at the time of the hearing, C.P. was ten years old, J.P. was eight years old, and B.P. was seven years old, with all three children then being developmentally on target. Miller testified that adoption would benefit the

children and she believed it is likely that each of the children would be adopted if permanent custody was granted to the agency.

**{¶126}** Under cross-examination, Miller testified that she did not agree with how things were handled with some of the professional referrals made to provide assistance to the parents. Miller testified that, during a forensic interview she conducted with the children, the children ran out of the room to ask Johnathon if they were allowed to answer the questions, and that is something that Miller had never experienced in her career. When asked about injuries suffered by B.P. in October of 2023, Miller confirmed her opinion that the injuries were consistent with child abuse. Miller confirmed that the sexual abuse allegation made at that time was unsubstantiated by CPSU. Miller confirmed that no family members were approved as placement options for the children. Miller testified that Johnathon's mother, Nancy, refuses to communicate with the agency. Miller testified that, as to the various injuries suffered by the children over time, the children gave inconsistent versions of how the injuries occurred. Miller testified that, while in foster care, she did not recall the children having any unexplained injuries.

**{¶127}** Timothy Hoover testified that he is an attorney and the guardian ad litem for C.P., J.P., and B.P. Hoover had been involved in the case since approximately August of 2022. Hoover identified the final report that he submitted in the case on May 20, 2024. Hoover also identified a prior and more detailed report that he had filed in January of 2024. Hoover recommended that the motion for

permanent custody be granted as to all three children, based on his investigation in the case. Hoover testified that, 39 months into the case, the children are in need of legally secure and permanent placement, and their best interest dictates that permanent custody be granted to the agency. Hoover testified that B.P. was in agreement with that recommendation but that C.P. and J.P. were not, as the boys wished to be reunited with their father. Hoover testified that the testimony given in court during the hearing served to reinforce his own opinion that permanent custody should be granted.

{¶128} On cross-examination, Hoover testified that he believed he had been in agreement with all the case plans in the case but, following the last removal of the children from Johnathon's home in October of 2023, he began seriously thinking that permanent custody was appropriate. Hoover testified that C.P. and J.P. speak well of their father, that they love him, and are bonded with him. Hoover testified that termination of Johnathon's and McKenna's parental rights was "10,000 percent" in the best interest of B.P., and that he had grave concerns for her safety should she be returned to the home of either parent. Finally, Hoover testified that neither Johnathon nor McKenna should parent children ever again.

{¶129} McKenna P. testified that she is the mother of C.P., J.P., and B.P. McKenna testified that the children are very playful during their visits with her. She testified that the boys have asked several times about coming back to her house. McKenna testified that she found the home coaching helpful and that she

had benefitted from it. McKenna stated she engaged in mental health counseling as soon as she was told to, is compliant with her treatment, and has made progress dealing with her PTSD and trauma from being sexually abused as a child. McKenna testified that, before the case was opened, the kids loved school, although there were attendance issues due to transportation. McKenna testified that the children had become zombie-like, and were no longer the happy children she knew. McKenna testified that she has had issues with keeping the children in line, and they are no better now. McKenna testified that, when the children were in her care, there was a lot of love and the children were bonded with her. McKenna testified that she immediately broke up with her former boyfriend when his drug overdose caused the case to be opened, and she testified that she has not had a boyfriend for nearly two years. McKenna asserted that CPSU did not try to reunify the children with her. McKenna testified that she had never seen any sexualized behavior in any of the children prior to the removal, nor had she witnessed any such behavior since. McKenna testified that any trauma to the children was caused by CPSU.

{¶130} During cross-examination, McKenna testified that any bumps or bruises sustained by the children were not caused by her, nor did she believe that Johnathon caused them. McKenna testified that the children play hard and that is what causes such injuries.

{¶131} Johnathon P. testified that he has lived in Pemberville, Ohio since August of 2023, in a five-bedroom home that he rents from his mother. He testified

that the children's bedrooms and bathrooms would be gender-segregated if the children came to live with him. Johnathon testified that such segregation is necessary because the children began exhibiting unruly behavior of a sexual nature when they came to live with him in 2021. Johnathon stated that he reported such behavior to CPSU but was not given adequate help with it. Johnathon testified that the children first came to live with him in approximately May of 2021, three weeks after they had been removed from their mother's home. The boys were enrolled in school at that time. C.P. was initially struggling academically but Johnathon testified that he was able to get C.P. back on track after working with him. Johnathon testified that J.P. had behavioral issues at school but that those habits were ultimately curbed. Johnathon testified that the children were removed from his home in October of 2021 because he spanked J.P. with an open hand, causing the bruises that J.P.'s teacher then observed. Johnathon denied ever striking C.P. or B.P.

{¶132} Johnathon testified that, as required by CPSU, he completed a drug and alcohol assessment and no follow-up treatment was required. Johnathon testified that he also completed mental health counseling and was successfully discharged from that. Johnathon stated that the agency was unhappy that he had been cleared by his counselor. Johnathon testified that, after the children were placed in foster care in West Liberty, it was difficult to attend visits with them at times. Johnathon testified he was unable to communicate appropriately with his

children because everything is monitored and anything that is said can be misconstrued. Once the visits were moved to Harmony House in Findlay, it became easier to visit and Johnathon believed the visits went well. Johnathon testified that reunification has never been the goal of CPSU, even though he worked the case plan throughout the pendency of the case. Johnathon denied having coached the children as to their communications with the agency.

{¶133} Johnathon was asked about the numerous bruises found on B.P. during the S.A.N.E. exam in October of 2023, and he proffered guesses as to how of some of those might have occurred, while denying knowledge of others. Johnathon testified that his children are reckless and hyper and they play roughly. Johnathon testified that it is against his beliefs to use medicine to fix certain ailments, but he was not given a say in the children taking medication. He testified that, if required, he would keep the children on medication, but he acknowledged that he had previously discontinued their use of the medication. Johnathon testified that he believes the children have suffered trauma, resulting initially from poor parenting skills but then compounded by the ongoing CPSU case as the agency had not given the children a chance to work through the trauma. Johnathon testified that he has lived in fear throughout the case but that he has grown to be an awesome father. Johnathon testified that he loves his children with every fiber of his being and the children love him and want to come home.

{¶134} In the written decisions issued by the trial court on June 10, 2024, the trial court reviewed the evidence presented at the permanent custody hearing in light of the best-interest analysis required by R.C. 2151.414(D) before determining that permanent custody of C.P., J.P., and B.P. should be granted to the agency.

{¶135} Following this Court's independent review of the record, we find that the trial court took all relevant evidence into account and properly applied the appropriate statutory factors in making its "best interest of the child" determination as to each of the three children and with regard to both parents, individually. As discussed below, the trial court's decisions were supported by clear and convincing evidence, and the weight of the evidence presented at the permanent custody hearing justified the determination that a grant of permanent custody to the agency is in the best interest of C.P., J.P., and B.P.

{¶136} The evidence in these three cases overwhelmingly established that C.P., J.P., and B.P. are very troubled children with significant emotional health issues and behavioral challenges due, at least in part, to the fact they each suffer from attention-deficit/hyperactivity disorder ("ADHD"). Due to having ADHD, the well-being of those children demands near constant parental or adult monitoring of the children themselves, as well as ongoing psychological and medical oversight and intervention. While both McKenna and Johnathon appear to love their three children and are bonded with them to varying degrees, the documented history of these cases firmly established that neither parent possesses the aptitude or ability

necessary to keep the children healthy and safe, much less to help them thrive. The evidence adduced at the permanent custody hearing clearly and convincingly proved that neither parent is able to adequately supervise the children or care for their special needs, and therefore neither McKenna or Johnathon can provide those children, individually or collectively, with a stable, safe, and nurturing environment.

{¶137} The specific factors that must be considered in determining whether permanent custody is in a child's best interest are set forth in R.C. 2151.414(D), as detailed above. In this case, as to each of the three children, the evidence established a consistent pattern of behavioral improvement, healthy development, and meeting of appropriate milestones when in foster care. On the other hand, such improvements abruptly and significantly declined when the children interacted with or were cared for by either parent. Regarding the wishes of the children, C.P. and J.P. wanted to be returned to their father's custody, while B.P. agreed with the recommendation of the guardian ad litem that permanent custody should be granted to the agency. Given the young ages and lack of maturity of the three children, those wishes are entitled to consideration but very little weight. *See* R.C. 2151.414(D)(1)(b). The evidence established that all three children desperately need a legally secure and permanent placement, which is something that neither parent was historically able to provide, and there was no indication that any of the three children could be safely returned to either parent in the near future. While both McKenna and Johnathon complied to a fair extent with the services

recommended by the agency in order to complete the objectives set forth in the applicable case plans, we note again that case plan compliance does not preclude a grant of permanent custody. *E.g., In re Gomer*, 2004-Ohio-1723, ¶ 36 (3d Dist.). Further, while the evidence established that McKenna is employed and has reasonably safe housing and, likewise, that Johnathon has a retirement income and suitable housing, the remaining evidence overwhelmingly established that neither parent demonstrated the ability to provide a consistently safe, stable, and nurturing environment for any or all of the three children at issue here.

{¶138} Upon considering all relevant factors, and on the basis of all the evidence detailed above, we find the trial court's permanent custody decisions as to C.P., J.P., and B.P. were supported by clear and convincing evidence and were not against the manifest weight of the evidence.

{¶139} Therefore, we overrule McKenna's assignment of error relating to C.P., J.P., and B.P., we overrule Johnathon's first assignment of error, and we overrule J.P.'s third assignment of error.

*Johnathon's Second Assignment of Error*

{¶140} In Johnathon's second assignment of error, he argues that the trial court erred in removing all three of the children from his custody in October of 2023, and in then failing to return C.P. and J.P. to his custody after a hearing was held on the evidence supporting that removal.

{¶141} As previously noted, C.P., J.P., and B.P. were in Johnathon's custody for the second time from August 23, 2023 until early October of that year, with the agency retaining protective supervision. On October 5, 2023, the trial court signed an ex parte order placing the children in the temporary custody of CPSU due to unexplained bruises on B.P. and allegations of sexual acts having been perpetrated on B.P. by C.P. and J.P. Following hearings held on October 10, 2023 and November 30, 2023, the trial court filed a judgment entry on December 6, 2023, in which the court found that probable cause existed for the issuance of the ex parte order and the emergency removal of the children from Johnathon's home.

{¶142} On appeal, Johnathon now assigns error with the trial court's December 6, 2023 decision.

{¶143} Regarding this claim, we note that this Court only has jurisdiction to hear appeals from final orders. *See* Ohio Constitution, Article IV, Section 3(B)(2); R.C. 2501.02. Also relevant here is the language of R.C. 2505.02(B)(1) providing that a final, appealable order is an order that "affects a substantial right in an action that in effect determines the action and prevents a judgment."

{¶144} In *In re Murray*, 52 Ohio St.3d 155 (1990), the Supreme Court of Ohio held that "[a]n adjudication by a juvenile court that a child is 'neglected' or 'dependent' as defined in R.C. Chapter 2151 followed by a disposition awarding temporary custody to a public children services agency pursuant to R.C. 2151.353(A)(2) constitutes a 'final order' within the meaning of R.C. 2505.02 and

is appealable to the court of appeals pursuant to R.C. 2501.02." *Id.*, at syllabus. An award of permanent custody to a children's services agency is also clearly a dispositive final order that is appealable. *See In re H.F.*, 2008-Ohio-499. However, a juvenile court's decision following a temporary shelter care hearing, such as the one with which Johnathon assigns error here, is not an adjudication and, due to its interlocutory nature and temporary duration, is in no sense dispositive. *In re Moloney*, 24 Ohio St.3d, 22, 25 (1986).

{¶145} Accordingly, to the extent that Johnathon's claim regarding the shelter care hearing decree of December 6, 2023 is not rendered moot by the trial court's subsequent dispositive and final orders granting permanent custody of C.P., J.P., and B.P. to the agency, we overrule Johnathon's second assignment of error on the basis of our disposition of his first assignment of error, *supra*.

*Conclusion*

{¶146} Having found no prejudicial error in the particulars assigned and argued by mother-appellant, McKenna P., the judgments of the Hancock County Common Pleas Court, Juvenile Division, terminating McKenna's parental rights in Case Numbers 5-24-18, 5-24-19, 5-24-20, and 5-24-21 are affirmed.

{¶147} Having found no prejudicial error in the particulars assigned and argued by father-appellant, Johnathon P., the judgments of the Hancock County

Case Nos. 5-24-18, 5-24-19, 5-24-20, 5-24-21

Common Pleas Court, Juvenile Division, terminating Johnathon's parental rights in Case Numbers 5-24-19, 5-24-20, and 5-24-21 are affirmed.

**{¶148}** Having found no prejudicial error in the particulars assigned and argued by child-appellant, J.P., the judgment of the Hancock County Common Pleas Court, Juvenile Division, in Case Number 5-24-21 is affirmed.

***Judgments affirmed***

**ZIMMERMAN and WILLAMOWSKI, J.J., concur.**

# <u>JUDGMENT ENTRY</u>

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgments of the trial court are affirmed with costs assessed to Appellants for which judgment is hereby rendered.  The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket.  See App.R. 30.

Juergen A. Waldick, Judge

William R. Zimmerman, Judge

John R. Willamowski, Judge

DATED:
/jlm